IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | | |
|---|---|---|
| WALTON CONSTRUCTION COMPANY, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 4:10-cv-137-WS/CAS |
| CORUS BANK, et al., | ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Laketown Funding, LLC ("Mezzanine Lender"), Starwood Asset

Management, LLC ("Starwood Asset"), and Starwood Capital Group Global, LLC (k/n/a

Starwood Capital Group Global I, LLC) ("Starwood Capital") (collectively referred to herein as

"Defendants"), by and through undersigned counsel, hereby file their Statement of Undisputed

Material Facts in Support of Motion for Summary Judgment (the "MSJ") and give Notice of the

attached summary judgment evidence, as follows:

**I.      STATEMENT OF UNDISPUTED MATERIAL FACTS.**

The following facts are undisputed and support Defendants' Motion for Summary

Judgment.

1.      Walton Construction Company, LLC ("Walton") was the general contractor for the

Laketown Wharf condominium construction project in Panama City Beach, Florida (the

"Project").  Doc. 18 (First Amended Complaint), ¶¶ 9-10; Doc. 34 (Answer), ¶¶ 9-10.

2.      Laketown Wharf, LLC ("Developer") was the owner and developer of the Project.  Doc.

18, ¶ 10; Doc. 34, ¶ 10.

3.   On or about May 6, 2005, Walton and Developer entered into a construction contract that governed the terms of Walton's work on the Project (the "Construction Contract"). Walton attached a partial copy of the Construction Contract to its First Amended Complaint as Exhibit A.  Doc. 18, ¶ 10; Doc. 34, ¶ 10; Doc. 18-1 (Construction Contract—without A201 General Conditions document or referenced exhibits).

4.   Developer obtained a first priority construction loan for the Project from Corus Bank, N.A. ("Senior Lender") in the amount of $146,300,000.  *See* Senior Lender's Adversary Proceeding, No. 09-04009-LMK (Bankr. N.D. Fla., filed Feb. 10, 2009), Doc. 1, ¶ 32; *see also In re: Laketown Wharf Marketing Corp.*, No. 08-40692-LMK (Bankr. N.D. Fla., filed September 29, 2008), Claim No. 35-1 (Senior Lender's Proof of Claim and attachments).

5.   Developer obtained a second priority loan for the Project from Laketown Funding, LLC ("Mezzanine Lender") in the amount of $43,000,000.  Doc. 18, ¶ 11; Doc. 34; ¶ 11; *see also In re: Laketown Wharf Marketing Corp.*, No. 08-40692-LMK (Bankr. N.D. Fla., filed Sept. 29, 2008), Claim No. 294-1 (Mezzanine Lender's Proof of Claim).  Loan documents are in the Bankruptcy Record as attachments to Claim No. 294-1.

6.   Mezzanine Lender lent Developer the entirety of the $43,000,000 at the beginning of the Project for land acquisition and pre-development costs.  Dep. Tr. of Karen Purdy, p. 13, ll. 7-12; *see also* Dep. Ex. 100; *see also* Dep. Tr. of Tom Budde, p. 82, ll. 12-21 (confirming understanding that Mezzanine Lender funded 100% of its loan obligation to Developer).

7.    On or about May 6, 2005, Walton executed a consent and agreement related to the

mezzanine loan of Mezzanine Lender (the "Consent and Agreement").  Doc. 18, ¶ 12;

Doc. 34, ¶ 12; Doc. 18-2 (Consent and Agreement).

8.    In the Consent and Agreement, Walton agreed to the following terms:

> Contractor [Walton] agrees to look solely to Borrower [Developer] for the performance of all of the obligations under the Construction Contract. . . .  In the event of a default under the terms of the Construction Contract ("**Construction Contract Default**") or any other event granting the Contractor the right to terminate or suspend performance thereunder, Contractor will deliver written notice to [Mezzanine] Lender thereof simultaneously with delivery of notice (whether written or oral) thereof to Borrower.  Within fifteen (15) days after receipt of such written notice from Contractor, Lender shall advise Contractor whether Lender intends to exercise its right to cure such Construction Contract Default or cause such Construction Contract Default to be cured.  To the extent Lender makes such election, Lender shall have then have [sic] the right, but not the obligation, for a period of thirty (30) days after such election, to cure such Construction Contract Default or cause such Construction Contract Default to be cured.

Doc. 18-2, p. 2 (emphasis in original).

> Upon the occurrence of an Event of Default under the Loan Agreement, Lender shall have the right, upon written notice to Contractor, to terminate the Construction Contract, in which event, Contractor shall have a claim for payment for the amounts as provided in the Construction Contract . . .  If Lender does not elect to terminate the Construction Contract in accordance with the foregoing, after the occurrence of any Event of Default under the Loan Agreement, and if Lender elects to complete construction of the Project (or any part thereof), Contractor shall, upon written request of Lender, provide Services to Lender (or its successors or assigns) under the terms of the Construction Contract . . . .

*Id.*

> Nothing contained in the Construction Contract or this [Consent and] Agreement shall . . . obligate Lender to make any disbursement under the Loan Agreement in a manner other than that contemplated by the Loan Agreement or provide Contractor with any right to require such disbursement [or] impose any

> liability on Lender or obligate Lender to perform any of
> Borrower's obligations under the Construction Contract, except to
> the extent that such liability or obligations are expressly assumed
> by Lender in writing.

*Id.*, p. 3; *see also* Dep. Tr. of Bill Petty, p. 109, l. – p. 112, l. 19.

9.    The Project is a concrete condominium structure with mixed use elements, such as retail

and office space, with approximately 765 condominium units, located in Panama City

Beach, Florida.  Doc. 18-1, p. 1.

10.   The Construction Contract contemplated that Walton would complete the North Tower

(Phase I) of the Project in 479 calendar days from the Commencement Date, or

approximately late August 2006, and would substantially complete the entire Project,

including the South Tower (Phase II), within 599 calendar days from the Commencement

Date, or approximately late December 2006.  *Id.*, § 4.3.

11.   By early 2006, the Project was substantially behind schedule.  Dep. Tr. of Bill Petty, p.

116, l. 9 – p. 120, l. 12; Dep. Ex. 22.

12.   In April 2007, Developer and Walton entered into a Change Order and Settlement

Agreement addressing certain change orders requested by Walton and delays to the

Project prior to that time.  Dep. Tr. of Bill Petty, p. 121, l. 6 – p. 122, l. 2; Dep. Ex. 23.

In the Change Order and Settlement Agreement, dated April 4, 2007, Developer agreed to

compensate Walton for the various change orders resolved therein in the amount of $11

Million.  Dep. Ex. 23.  Specifically, Developer agreed to pay Walton $2 Million, and

Walton agreed to accept a promissory note from Developer for $9 Million, secured by a

third mortgage on the Project property and deferred until Senior Lender and Mezzanine

Lender were paid in full on their respective loans.  *Id.*; ¶ 3(d).  Neither lender agreed to

fund payment to Walton for the amounts in this Change Order and Settlement Agreement. Dep. Tr. of Tom Budde, p. 49, l. 23 – p. 50, l. 7.

13.   The April 4, 2007 Change Order and Settlement Agreement also granted Walton a time extension until May 1, 2007 for Phase I of the Project and until June 2, 2007 for Phase II of the Project. Dep. Ex. 23, ¶ 3(a).

14.   In July 2007, Developer and Walton agreed to an additional time extension: for Phase I until August 31, 2007 and for Phase II until November 15, 2007. Dep. Ex. 6.

15.   Walton did not complete Phase II of the Project by November 15, 2007. *Id.* Walton obtained a Certificate of Occupancy for Phase II of the Project on April 22, 2008. *Id.* Walton considered Phase II substantially complete as of April 22, 2008, a 158 day delay to the completion date established by the agreement of Developer and Walton in July 2007. *Id.*

16.   Walton took the position that the delays it experienced between July 2007 and April 2008 were caused by actions or inactions of Developer and/or Developer's architect for the Project. *Id.*; Dep. Tr. of Steve Ellis, p. 36, l. 4 – p. 37, l. 20. Walton agrees that no action or inaction of either Project lender lead to delays on the Project prior to April 22, 2008, when Walton obtained to Certificate of Occupancy for Phase II of the Project. Dep. Tr. of Bill Petty, p. 120, ll. 20-25; 122, ll. 3-15; Dep. Tr. of Tom Budde, p. 130, ll. 8-13.

17.   In late 2007, Developer's designated Owner Representative, Tom Duggan, became absent from the site, and Walton did not have an official Developer representative to deal with regarding issues such as late payments, negotiating change orders, and approval of Walton's work. Dep. Tr. of Steve Ellis, p. 50, l. 12 – p. 51, p. 20; *see also* Dep. Ex. 35 (exhibits to same regarding letters to Developer asking about authorized representative).

18.   Around the time of Tom Duggan's disappearance from the Project, Walton's Steve Ellis reached out to representatives of both Project lenders to seek assistance with Developer's late payments, negotiation of change orders, and approval of Walton's work. Dep. Tr. of Steve Ellis, p. 53, ll. 1-25.

19.   In early 2008, Walton specifically requested the assistance of Byron Hayes, a representative of the Mezzanine Lender, with respect to late payments from the Developer, negotiation of change orders, and acceptance of Walton's work. *Id.*, p. 61, ll. 2-10.

20.   Prior to requesting assistance from Mr. Hayes, Walton sought the same assistance from John Zander, a representative of Senior Lender. *Id.*, p. 62, l. 3 – p. 63, l. 4; p. 67, l. 8 – p. 68, l. 11.

21.   Walton first contacted Senior Lender because Senior Lender's loan was the specified funding for construction. *Id.*, p. 69, ll. 17-21.

22.   In January 2008, a meeting took place at the Project site where Walton's Steve Ellis, Senior Lender's John Zander, Mezzanine Lender's Byron Hayes, and Shawn Cunningham (a Developer representative) met to negotiate change orders that Walton had presented to the Developer and to discuss acceptance of Walton's work. *Id.*; p. 72, ll. 8-13 (timing and purpose of meeting with John Zander on site); p. 78, l. 18 – p. 79, l. 7 (purpose of meeting with Zander, Hayes, and Cunningham); p. 81, l. 16 – p. 82, l. 8 (same and summary of meeting). None of the work included in the change orders discussed at this January 2008 meeting was work that either lender or their representatives had requested Walton to perform. *Id.*, p. 82, ll. 9-13. Regarding the meeting, Walton's Steve Ellis summarized the meeting as follows:

> This is how I took it. We were at an impasse with an unresponsive owner. The only outlet we had was to go to a lender. They had been involved in the project early on. I remember a conversation with Jeff Morris about getting us paid, getting our change orders taken care of. He says I can get it done. I'm going to send Byron Hayes there and John Zander will meet you there and we'll get them agreed to and resolved.

*Id.*, p. 82, l. 19 – p. 83, l. 2.

23.   Following the meeting in January 2008, Walton received payment for the change orders negotiated at that meeting (pursuant to a change order executed between Walton and Developer in late February 2008) and received payment for certain payment applications that had not been timely paid; these payments came to Walton from Developer, not directly from either lender. *Id.*, p. 87, ll. 12-21 ("Q. Who did that payment come from? A. The same people that we've been getting paid all along. Q. Laketown Wharf, LLC? A. Yes."); Dep. Ex. 5 (Change Order 11).

24.   In April 2008, Walton received its last payment from Developer for work on the Project. Dep. Exs. 3, 4; Dep. Tr. of Steve Ellis, p. 93, ll. 14-17. Walton believed that Developer was in default of its obligations under the Construction Contract as of late April 2008. Dep. Tr. of Bill Petty, p. 140, ll. 1-20; p. 144, ll. 14-24.

25.   By this time, Walton understood that the Developer did not have money to pay Walton for its work independent of any amounts that might be funded to Developer by a lender. Dep. Tr. of Steve Ellis, p. 98, ll. 14-25; p. 114, l. 4 – p. p. 115, l. 21.

26.   On May 21, 2008, Walton sent a letter to Developer representative Shawn Cunningham giving Developer "seven day notice of non-payment" with reference to Article 9.7 of the General Conditions of the Construction Contract. Dep. Ex. 7. Walton did not copy either Project lender on this letter. *Id.* Walton corresponded with Developer several times in

regards to this letter—with Developer sending a letter to Walton on May 28, 2008 (Dep. Ex. 9), with Walton responding to Developer in a letter of June 3, 2008 (Dep. Ex. 10), with Developer responding to Walton in a letter of June 6, 2008 (Dep. Ex. 11), and with Walton's final response letter dated July 11, 2008 (Dep. Ex. 12). None of these letters were addressed to either Project lender or signed and sent from either Project lender.

27.   On the same day (May 21, 2008), Walton sent a separate letter to Developer requesting an extension of time on the Project with respect to the Phase II completion date and addressing a request for additional compensation in the amount of $5,907,570 for "extended project costs" related to delay. Dep. Ex. 6. Follow-ups to this letter included a letter from Developer to Walton dated May 28, 2008 (Dep. Ex. 8) and a letter from Walton to Developer dated June 3, 2008 (Dep. Ex. 13). These letters were addressed to or from Walton and Developer, not either Project lender. Dep. Exs. 6, 8, 13. Walton agrees that no action or inaction by the lenders caused the delays addressed in these letters. Dep. Tr. of Steve Ellis, p. 151, ll. 11-21.

28.   On September 12, 2008, Walton sent a formal notice of non-payment to Developer, Senior Lender, and Mezzanine Lender. Dep. Ex. 18.

29.   On September 15, 2008, Senior Lender responded to Walton's formal notice of non-payment. Dep. Ex. 19. In this letter, Senior Lender's counsel advised Walton that the Project property had been conveyed to an "affiliate" of Senior Lender called Laketown Wharf Marketing Corporation, as of September 12, 2008. *Id.* Senior Lender also advised that it would be responding to Walton's letter within the fifteen (15) days contemplated by the consent and agreement document Walton had signed in 2005 with respect to Senior Lender. *Id.* Within that period, Laketown Wharf Marketing Corporation filed for

Chapter 11 Bankruptcy. *See In re: Laketown Wharf Marketing Corp.*, No. 08-40692-LMK (Bankr. N.D. Fla., filed September 29, 2008).

30.    In late 2007, Mezzanine Lender had formulated an action plan that contemplated taking control of the Project property, accelerating the mezzanine loan, commencing the exercise of remedies, and bringing in an affiliate to oversee completion of construction. Dep. Ex. 31.  This plan was never put into action, however, because Senior Lender would only allow Mezzanine Lender to foreclose on the equity in the Project, as opposed to the full mezzanine debt.  Dep. Ex. 100; *see also* Dep. Tr. of Byron Hayes, p. 23, ll. 8-18.

31.    When Developer defaulted on interest payments to the Senior Lender in January 2008 (*see* Dep. Ex. 30), Mezzanine Lender made the interest payment to Senior Lender in order to prevent Senior Lender from foreclosing on the Project, which would wipe away Mezzanine Lender's security interest in the Project.  Dep. Tr. of James Kane, p. 61, l. 8 – p. 62, l. 13.

32.    Mezzanine Lender decided to make this and future protective advances in order to buy time for Mezzanine Lender to assess the financial and physical condition of the Project, and to determine where its debt stood in the "capital stack"—an analysis of where Mezzanine Lender's $43 Million loan stood in priority compared with Senior Lender's far greater loan and the anticipated value of the Project at completion. *Id.*; *see also id.*, p. 65, l. 25 – p. 66, l. 15; Dep. Tr. of Karen Purdy, p. 19, l. 17 – p. 20, l. 6.  Due to time constraints, Mezzanine Lender made some protective advances—such as to Senior Lender for interest payments owed by Developer and to law firms for retainer replenishment related to closing costs and condominium document preparation—directly to the parties who received the payments.  Dep. Tr. of Karen Purdy, p. 25, ll. 11-22.

Protective advance payments were paid from the account of Mezzanine Lender's sole member, SOF-VI U.S. Holdings II, LLC. *Id.*

33.    Mezzanine Lender was not obligated by any written agreement to make protective advances. Forbearance Agreement (Ex. I); Dep. Tr. of James Kane, p. 68, l. 23 – p. 70, l. 13; Dep. Tr. of Karen Purdy, p. 89, ll. 5-14.

34.    In approximately late June to early July 2008, Developer entered into forbearance agreements separately with Senior Lender and Mezzanine Lender, which constituted amendments to the two Project loans to Developer. Forbearance Agreement; Intercreditor Agreement (Ex. J); Dep. Ex. 100.

35.    In the Forbearance Agreement between Developer and Mezzanine Lender, Developer acknowledged that construction costs, including any costs owed to Walton on the Project, were to be paid for with funds from the Senior Loan (defined therein as Senior Loan Required Payments) (*see* Forbearance Agreement, Article 8(a)) and acknowledged that it, Developer, was responsible for paying Walton for any construction costs that went above the amount of Senior Lender's unfunded loan commitment (*see* Art. 11)—in other words, any unfunded Senior Loan Required Payments. Developer also acknowledged it did not have sufficient funds to do so. Forbearance Agreement, Art. 8(c). Developer acknowledged that Mezzanine Lender could, "in its sole and absolute discretion" pay such costs as a protective advance. *Id.*, Art. 12(a).

36.    Developer, Mezzanine Lender, and Senior Lender also entered into an Intercreditor Agreement, dated June 27, 2008, related to the forbearance agreements Developer entered into with the lenders in late June or early July 2008. *See* Intercreditor Agreement (Ex. J). The Intercreditor Agreement addressed the possibility that Mezzanine Lender

could commence action to take ownership in the equity of the Project, at any time after August 31, 2008. *Id.*, Art. 5(b) (p. 7; Bates Labeled LF00283).

37.     The Forbearance Agreement provided that Mezzanine Lender could begin recovering money to pay-off its mezzanine loan on the Project once the 127th condominium unit sold. Forbearance Agreement (Ex. I), p. 13. Unfortunately, less than 100 condominium units were sold before the Project was in Bankruptcy. Dep. Tr. of Karen Purdy, p. 94, l. 15 – p. 95, l. 9.

38.     Around the time that Developer and the lenders entered into the Forbearance Agreement, the consultant retained by the lenders to assess closings and unit sale prices returned a dire report, suggesting that many less units would close than expected and for a much lower price than necessary to make the situation possible. Dep. Tr. of Karen Purdy, p. 90, l. 2 – p. 91, l. 7.

39.     Mezzanine Lender did not commence any action to take ownership in the equity of the Project, as the Project was fully conveyed to an affiliate of Senior Lender on September 12, 2008 and placed into Chapter 11 Bankruptcy on September 28, 2008. *Id.*, p. 89, l. 15 – p. 90, l. 1; *see In re: Laketown Wharf Marketing Corp.*, No. 08-40692-LMK (Bankr. N.D. Fla., filed September 29, 2008); Dep. Ex. 19.

40.     At no time did Mezzanine Lender assume the Construction Contract between Walton and Developer as contemplated by the May 6, 2005 Consent and Agreement. Doc. 31 (Court Order on Motion to Dismiss), p. 15; Dep. Tr. of Tom Budde, p. 108, l. 22 – p. 109, l. 3; Dep. Tr. of Karen Purdy, p. 96, ll. 17-25.

41.     At no time did Mezzanine Lender request in writing that Walton perform its construction work on the Project for Mezzanine Lender or state in writing to Walton that Mezzanine

Lender or any related entity would pay Walton directly for its work on the Project. Dep. Tr. of Tom Budde, p. 79, ll. 5-16.

42.    Walton never sent Mezzanine Lender, or any entity related to Mezzanine Lender, any letter, e-mail, fax, or other writing confirming any agreement that Mezzanine Lender, or a related entity, had made to assume the Construction Contract or to pay Walton directly for its work on the Project. Dep. Tr. of Steve Ellis, p. 110, ll. 5-11; Dep. Tr. of Tom Budde, p. 109, ll. 4-9. Walton did not change its billing process to begin sending its payment applications to Mezzanine Lender, or any entity related to Mezzanine Lender, but rather continued to treat Developer as the owner of the Project, with whom Walton had the Construction Contract. Dep. Tr. of Steve Ellis, p. 127, l. 10 – p. 128, l. 12, p. 159, ll. 15-20; Dep. Tr. of Tom Budde, p. 91, l. 22 – p. 92, l. 13; p. 94, l. 14 – p. 95, l. 6; p. 105, ll. 13-21. Walton understood throughout 2008 that Developer remained owner of the Project, and Walton continued to deal with Developer as owner of the Project:

> Q.    My question was, as of July 11, 2008, was Walton's position that a Starwood entity was the owner of the project?
>
> [Objection]
>
> A.    As being the owner at that time, no.
>
> Q.    Laketown Wharf, LLC was still the owner?
>
> A.    Yes. At that time they were still an entity, yes.
>
> Q.    And the contract between Walton and Laketown Wharf, LLC to construct the Laketown project was still in full force and effect?
>
> A.    Yes.
>
> Q.    And there was a dispute over whether certain payments were due and they were outstanding

> payment applications that Walton had submitted to Laketown Wharf, LLC by July of 2008, right?

A.   Yes.

Q.   However, up until that time when Walton was corresponding with someone about nonpayment, that correspondence was between you on behalf of Walton and Shawn Cunningham on behalf of Laketown Wharf, LLC, is that right?

[Objection]

A.   That's correct.

Dep. Tr. of Steve Ellis , p. 165, l. 4 – p. 166, l. 5.

43.   Walton contends that Jeff Morris and Byron Hayes, apparently on behalf of all three Defendants, made statements to Walton personnel representing that if Walton did certain things, such as complete construction work on the Project or satisfy audit requirements, that Walton was assured of payment for its work on the Project.  Any such statements, if made, specifically did not instruct Walton that Walton should expect payment for its work on the Project directly from any of the three Defendants in this Action:

Steve Ellis testimony:

Q.   So Jeff Morris never told you specifically that Laketown Funding, LLC would pay Walton Construction Company, LLC for any specific payment application, change order, or any work that Walton had done on the project?

A.   I don't recall that he said who we would be paid by. He said, you will get paid.

Q.   So the answer to my last question is, no?

A.   Well, ask it again.

Q.   Can you repeat my last question?

(Record read.)

Q.  You testified that what Mr. Morris told you at different times was that Walton would get paid?

A.  Yes, sir.

Q.  He didn't tell you who would pay Walton?

A.  No.  He did not.

Q.  He didn't tell you how Walton would get paid?

A.  He did not.

Q.  And that was similar to what Mr. Zander had told you back in December of 2007.  Mr. Zander had told you that Walton would get paid, but he didn't tell you who or how?

A.  Yes.

Q.  Mr. Morris never told you that Laketown Funding, LLC would pay Walton Construction Company, LLC for its work on the Laketown Wharf project?

A.  No.  Like I said, he said we would be paid.  It wasn't discussed how we would be paid in my presence.

Q.  Mr. Morris never told you that Starwood Capital Group Global, LLC would pay Walton Construction Company, LLC for any of Walton's work on the project?

A.  I don't know that he said that exactly.

Dep Tr. of Steve Ellis, p.106, l. 18 – p. 108, l. 3.

Q.  So like Mr. Morris, Mr. Hayes never told you that Laketown Wharf -- I'm sorry.  Laketown Funding, LLC or Starwood Asset Management, LLC or Starwood Capital Group Global, LLC, specifically would be paying Walton directly for anything on Laketown Wharf project?

A.    That is correct.   You know, the presumption was that's who they worked for.  That's what they were telling me, but they did not say it.

*Id.*, p. 125, ll. 12-20.

He [Byron Hayes] said – like I said before, he never said the words, Starwood would pay you.   He represented Starwood and I knew that for a fact and he told me, that we would get paid.

*Id.*, p. 201, ll. 10-13.

Bill Petty testimony:

Q:    Did he [Jeff Morris] tell you, what company would pay Walton?

A:    No.  No.  You know what, in the heat of that whole meeting, the whole spirit of the meeting was that necktie, thousand, $2,000 suit, coming in on the Fourth of July weekend.   Representing the whole thing, coming in like that, was being theatrical.  He came in, he did not say, you satisfy this audit Bill Petty and Starwood will write you a check.  But, when he's sitting there, representing Starwood that, Jerry, you can't find Jerry, Tom Duggan's dead or moved, right.  He's representing that he will pay or cause happen that payment, right.  That's what he said and that's the way I took it.

I didn't interrogate him, I'm not a lawyer looking for a -- it would've been -- it would've been strange to me.  Can you put that in writing?  I didn't do any of that.  Because, I took him at his word.  I believed him.  I believed him when he told me that you satisfy this audit, sir.  You will be paid, right. . . .

Q.    Did you understand after that meeting that if Walton finished its work and it got paid, pursuant to what Mr. Morris told you, that the money that would pay Walton would go from some Starwood company to Laketown Wharf, LLC and then to Walton or did you understand that it would go from some Starwood entity directly to Walton via check or wire?

A.    I didn't.  I didn't understand how it would happen.  I believed one thing, that it would happen.  That's it.  The transaction -- I didn't -- I didn't know.  I did believe that it would happen though.

Dep. Tr. of Bill Petty, p. 163, l. 1 – p. 164, l. 18.

Tom Budde testimony:

Q.    You said earlier that Mr. Morris said, you will get paid, Walton will get paid.  Were those the words that he used?

A.    He used words to that extent, yes.

Q.    Did Mr. Morris specifically state in your presence that Walton would be paid directly by Starwood Capital Group Global, LLC?

A.    No.  He did not say those words.

Q.    Did Mr. Morris say in your presence that Walton would be paid for its work on Laketown Wharf by Starwood Asset Management, LLC?

A.    He did not say those words.

Q.    Did Mr. Morris in your presence say the words that Walton would be paid for its work on Laketown Wharf by Laketown Funding, LLC?

A.    He did not say those exact words.

Q.    Did Mr. Morris in your presence say specifically that Walton would be paid by Starwood for its work on the Laketown Wharf project?

A.    He did not say in those direct words.

Dep. Tr. of Tom Budde, p. 88, l. 7 – p. 89, l. 1.

Jeff Morris testimony:

Q.    During that meeting, do you recall making any statement that represented that Walton Construction

Company could expect payment for its work on the Laketown Wharf project directly from Laketown Wharf, LLC -- I mean -- I'm sorry.   Laketown Funding, LLC?

A.   Well, one, Laketown -- I can't even say Laketown and Lakewood either, so I don't -- once again, that would not have been in my vocabulary to say that. Okay?  And I know that Starwood was not funding any of this money per se, so the answer is no.

Q.   Do you recall making any statement during that meeting on July 2, 2008, representing to Walton Construction Company that it could expect payment for its work on the Laketown Wharf project to come directly from Starwood Asset Management, LLC?

A.   No.

Q.   Do you recall making any statement in that July 2, 2008 meeting, representing to Walton Construction Company that it could expect to receive payment for its work on the Laketown Wharf project directly from Starwood Capital Group Global, LLC?

A.   No.

Q.   Do you recall making any statement at any time, other than during the July 2, 2008 meeting, representing to Walton that it could expect payment for its work -- any work on the Laketown Wharf project directly from either Laketown Funding, LLC, Starwood Asset Management, LLC or Starwood Capital Group Global, LLC?

A.   Not that I recall, no.

Dep. Tr. of Jeff Morris, p. 123, l. 15 – p. 124, l. 20.

44.   Mezzanine Lender received no distribution or payment in Laketown Wharf Marketing

Corporation's Chapter 11 Bankruptcy case.  *In re: Laketown Wharf Marketing Corp.*, No.

08-40692-LMK (Bankr. N.D. Fla., filed September 29, 2008), Doc. 714 (Amended

Chapter 11 Plan), ¶ 2.2.3(b); Doc. 758 (confirming Doc. 714).

45.   Mezzanine Lender lost the entirety of its investment in the Project. In June 2011,

Mezzanine Lender's sole member, SOF-VI U.S. Holdings II, LLC, wrote-off a loss on

the Project of approximately $62,906,000, constituting the $43 Million mezzanine loan,

approximately $11 Million in protective advances, and another approximately $9 Million

in costs chargeable to the mezzanine loan (or chargeable to Developer pursuant to the

mezzanine loan agreement), such as missed interest payments and other legal fees. *See*

Mezzanine Lender's Supplemental Responses to Plaintiff's First Request to Produce,

attached hereto as Exhibit K; *see also* Dep. Tr. of Karen Purdy, p. 93, l. 5 – p. 94, l. 7;

Dep. Tr. of James Kane, p. 117, ll. 15-23. Walton has known this since late 2008. Dep

Tr. of Tom Budde, p. 126, ll. 15-23 (discussing Senior Lender telling Walton

representative in October 2008 that Mezzanine Lender was "walking away from $50

Million").

46.   Defendant Starwood Capital Group Global, LLC (n/k/a Starwood Capital Group Global I,

LLC) is the primary member of SOF VI Management, LLC, which was general partner in

two limited partnerships that were part of the investment or opportunity fund known as

Starwood Opportunity Fund VI—Starwood Global Opportunity Fund VI A, LP and

Starwood Global Opportunity Fund VI B, LP, which held respective percentage

ownership of SOF-VI U.S. Holdings II, LLC, which was the sole member of Mezzanine

Lender. *See* Starwood Capital Group's Responses to Plaintiff's Second Interrogatories,

p. 4-5, attached hereto as Exhibit L; Defendants' Supplemental Responses to Plaintiff's

Second Set of Interrogatories, attached hereto as Exhibit M. When Mezzanine Lender

lost its full investment in the Project and wrote-off the $62,906,000 loss, Defendant

Starwood Capital Group Global, LLC (n/k/a Starwood Capital Group Global I, LLC) lost any financial interest it retained in Mezzanine Lender and the Project.

47.     Defendant Starwood Asset Management, LLC is a limited liability company that Starwood Capital Group utilizes to manage assets that the various opportunity funds have an interest in, and employees of Starwood Asset act on behalf of the single purpose entities created to own, develop, or fund money to various assets.  Dep. Tr. of Karen Purdy, p. 8, ll. 13-15.  When Mezzanine Lender lost its full investment in the Project and wrote-off the $62,906,000 loss, Defendant Starwood Asset Management, LLC lost any financial interest it had in the Project.

48.     Walton has asserted a quantum meruit claim against the Defendants based on an allegation that Walton provided a benefit to Defendants for which Walton was not compensated.  Doc. 18, ¶ 35-42 ("benefit" allegations found in ¶ 67, which is not incorporated into Walton's quantum meruit count).  The benefit Walton alleges the Defendants received is increased value of the Project asset.  Dep. Tr. of Steve Ellis, p. 130, l. 8 – p. 132, l. 14; p. 194, l. 9 – p. 195, l. 2.


## II.     NOTICE OF FILING SUMMARY JUDGMENT EVIDENCE.

Attached hereto are the following Exhibits, which constitute Defendants' summary judgment evidence:

A.     Affidavit of Kent W. Collier, Esq., in Support of Motion for Summary Judgment

B.     Deposition Transcript of William "Bill" Petty ("Dep. Tr. of Bill Petty")

C.     Deposition Transcript of Steve Ellis ("Dep. Tr. of Steve Ellis")

D.     Deposition Transcript of Prentiss "Byron" Hayes ("Dep. Tr. of Byron Hayes")

E.      Deposition Transcript of James Kane ("Dep. Tr. of James Kane")

F.      Deposition Transcript of Jeffery Morris ("Dep. Tr. of Jeff Morris")

G.      Deposition Transcript of Thomas Budde ("Dep. Tr. of Tom Budde")

H.      Deposition Transcript of Karen Purdy ("Dep. Tr. of Karen Purdy")

I.      Forbearance Agreement

J.      Intercreditor Agreement

K.      Mezzanine Lender's Supplemental Responses to Plaintiff's First Request to Produce

L.      Starwood Capital Group's Responses to Plaintiff's Second Interrogatories

M.      Defendants' Supplemental Responses to Plaintiff's Second Set of Interrogatories

In addition, attached hereto are the following Deposition Exhibits, which are more fully described in Exhibit A (Collier Aff.): 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 18, 19, 22, 23, 30, 31, 35, and 100.

Respectfully submitted this 20th day of April, 2012.

SUTHERLAND ASBILL & BRENNAN LLP

_____

Jennifer W. Fletcher
Florida Bar No. 332089
Kent W. Collier
Florida Bar No. 39622
999 Peachtree Street, N.E.
Atlanta, GA 30309-3996
Phone:  404-853-8000
Fax:  404-853-8806
*Attorneys for Defendant Laketown Funding, LLC,
Starwood Asset Management, LLC, and Starwood
Capital Group Global I, LLC (f/k/a Starwood
Capital Group Global, LLC)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

WALTON CONSTRUCTION          )
COMPANY, LLC,                )
                             )
    Plaintiff,           )
                             )
v.                           )          Case No. 4:10-cv-137-WS/CAS
                             )
CORUS BANK, et al.,          )
                             )
    Defendants.          )
_____)

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing DEFENDANTS'

STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR

SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system which will

automatically send e-mail notification of such filing to the following attorneys of record:

    Eric Lewis Nelson
    SMITH CURRIE & HANCOCK LLP
    2700 Marquis One Tower
    245 Peachtree Center Ave. NE
    Atlanta, GA 30303-1227

    Brian G. Rich
    BERGER SINGERMAN PA
    125 S. Gadsden St.
    Suite 300
    Tallahassee, FL 32301

    This 20th day of April, 2012.

                                          Kent W. Collier
                                        Florida Bar No. 39622