**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

WALTON CONSTRUCTION )
COMPANY, LLC, )
       )
      Plaintiff, )
       )
v. )     Case No. 4:10-cv-137-WS/CAS
       )
CORUS BANK, et al., )
       )
      Defendants. )
_____ )

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

      Defendants Laketown Funding, LLC ("Mezzanine Lender"), Starwood Asset

Management, LLC ("Starwood Asset"), and Starwood Capital Group Global, LLC (k/n/a

Starwood Capital Group Global I, LLC) ("Starwood Capital") (collectively referred to herein as

"Defendants"), by and through undersigned counsel, hereby file their Memorandum of Law in

Support of Motion for Summary Judgment (the "MSJ") (Doc. 71) as follows:

**I.     SUMMARY OF ARGUMENT.**

      This case is an attempt by a contractor (Plaintiff Walton Construction Company, LLC, or

"Walton") to recover money it believes it is owed for work on a construction project from the

project's mezzanine lender and related parties. Walton's claims, however, are not supported by

the undisputed facts in this case, and Defendants are entitled to summary judgment on all of

Walton's remaining causes of action, as follows:

- Walton's quantum meruit claim fails because Walton provided no actual or legally-
  recognized "benefit" to Mezzanine Lender or the related Starwood defendants by
  allegedly increasing the "value" of the construction project asset by continuing to work

on the project. Mezzanine Lender lost the entirety of its investment in the project, and no Defendant received any return on any investment related to the project;

- Walton's fraud claim fails because the Statute of Frauds bars a tort claim based on an alleged agreement to pay the debts of another, because if the statements Walton alleges were made did occur Walton was not justified in relying on such statements when Walton knew and had previously agreed that Mezzanine Lender could only take on the obligations it allegedly promised to take on pursuant to a specific type of written agreement, and because it is undisputed that no representative of Mezzanine Lender or either Starwood defendant ever, with specificity and clarity, stated to Walton that Walton would or could expect to be paid directly for its work by any Defendant entity; and

- Walton's tortious interference claim fails because the Statute of Frauds also bars a tort claim when it is merely an attempt to sue regarding an unenforceable contract or on an agreement to pay the debts of another and because the undisputed actions by Mezzanine Lender with respect to Walton and the project do not legally constitute interference: the actions complained of were (a) allowed by the operative agreements, (b) specifically requested by Walton, (c) privileged and legally appropriate, and/or (d) not supported by the undisputed facts and the recognized circumstances of the project and parties.

## II.    FACTUAL BACKGROUND.

On May 6, 2005, Laketown Wharf, LLC (the "Developer") entered into a construction contract with Walton pursuant to which Walton agreed to construct the Laketown Wharf Project on a specified timeline and with compensation for its actual costs subject to a negotiated guaranteed maximum price (the "Construction Contract"). *See* Defendants' Statement of

Undisputed Material Facts ("SUMF") (Doc. 72), ¶¶ 1-3.[1] Developer obtained two substantial

loans related for the Project—a $43 Million loan with second priority position from Mezzanine

Lender specifically for land acquisition and predevelopment costs, and a $146.3 Million loan

with first priority position from Corus Bank, N.A. ("Senior Lender") to fund the costs of

Walton's construction work and other Project costs.  SUMF, ¶¶ 4-6.

      The Project is a large concrete condominium project in Panama City Beach, Florida, with

approximately 765 condominium units, in addition to mixed use features such as office and retail

space.  SUMF, ¶ 9.  The Construction Contract contemplated a schedule whereby the North

Tower (or Phase I) of the Project would be complete in 479 calendar days, or in late August

2006, and the entire Project, including the South Tower (Phase II), would be substantially

completed in 599 calendar days, or in late December 2006  SUMF, ¶ 10.  The Project began at a

time when commercial real estate in the Florida Panhandle was booming.  Had the Project

finished as originally contemplated in the Construction Contract, the Project might have hit the

market on the tail end of the boom.  Unfortunately for all involved, the Project would not receive

certificates of occupancy until April 2008, and closings would ultimately be pushed into a

substantially depressed real estate market as a result of the well-known financial and housing

crisis.  SUMF, ¶¶ 15, 37.

---

[1] Filed contemporaneously herewith is Defendants' Statement of Undisputed Material Facts (referred to herein as "SUMF"), which contains a short and concise statement of the material facts as to which the moving Defendants contend there is no genuine issue to be tried.  *See* Doc. 72; *see also* N.D. Fla. Loc. R. 56.1(A).  References to Paragraph numbers in the SUMF refer to the individually numbered paragraphs in Section I of the SUMF, and should be deemed to also refer to the evidence citations contained therein (i.e., affidavits, depositions, deposition exhibits, discovery responses, or documents).  Defendants expressly incorporate by reference herein the SUMF and all portions of attachments referenced specifically in Section I of the SUMF as summary judgment evidence.

By early 2006, the Project was already falling behind schedule.[2]  In April 2007, Walton and the Developer entered into a change order to address the significant delays that had occurred on the Project up to that time.  SUMF, ¶ 12.  Pursuant to this April 2007 change order, Walton received $2 Million in cash from Developer and a $9 Million third mortgage on the Project to secure other amounts that Developer could not pay in cash.  SUMF, ¶ 12.  Walton also received from the Developer a time extension to complete the two phases of the Project by May 1, 2007 and June 2, 2007, respectively.  SUMF, ¶ 13_.  Just a few months later, Developer granted Walton additional time extensions—for Phase I until August 31, 2007, and Phase II until November 15, 2007.  SUMF, ¶ 14.

By late 2007, despite over a full calendar year of time extensions granted by the Developer, Walton still was not finished with Phase II of the Project.  SUMF, ¶¶ 10-15.  Then, in November or December 2007, the Developer's designated owner representative, Tom Duggan, disappeared from or abandoned the Project, leaving Walton without a specific person to answer questions on behalf of the Developer.  SUMF, ¶ 17.  At the same time, Walton was experiencing delayed or late payments from Developer for its work.  SUMF, ¶ 17.  In December 2007, Walton chose to reach out to both Project lenders for intervention and assistance—both in encouraging

---

[2] Internally, Walton's then-President Bill Petty wrote as follows:

> We are in big trouble at Laketown Wharf.  55% of the contract time has elapsed and only about 25% of the Earned Value has been achieved.

> The buyout [of subcontracts] is incomplete, Walter [tunnel-form contractor] keeps falling behind, and there seems to be no Owner support of time extensions.  Even if we get a six week extension, we are still in deep shit. . . .

> I'm no genius, but I do know statistics.  It will be impossible to recover from here. . . .

> We need a surge of work on this job like we've never seen before.

SUMF, ¶ 11; Dep. Ex. 22.

late payments to be paid and for guidance related to acceptance of Walton's work and negotiation of change orders (none of which were related to lender action or inaction. SUMF, ¶ 16, 18-20. At the request of Walton, representatives from Senior Lender (John Zander), Mezzanine Lender (Byron Hayes), and Developer (Shawn Cunningham) met on site. SUMF, ¶ 22. As a result of the meeting, a number of pending change orders were resolved and a change order was executed between Walton and Developer, which Developer paid to Walton in April 2008. SUMF, ¶¶ 22-23. Following the meeting, Developer also made payments to Walton for previously submitted payment applications to resolve the issue of late payments. SUMF, ¶ 23.

The April 2008 payment from Developer to Walton for the change order negotiated in January 2008 was ultimately the last payment that Developer made to Walton regarding its work on the Project. SUMF, ¶ 24. By January 2008, Developer was apparently in a dire financial situation. SUMF, ¶ 25. The Project had extended well past the originally anticipated completion date (over eighteen months past), and Developer had difficulty keeping up with interest payments owed to the Senior Lender regarding its $146.3 Million construction loan; these interest payments amounted to nearly $1 Million a month. SUMF, ¶ 31. Not only did Developer not have the money to keep up its interest payments to Senior Lender, the Developer also apparently did not have the money to fund any more payments to Walton without additional disbursements from the Senior Lender, who still had millions of dollars left in the construction loan that were unfunded to Developer (by contrast, the entirety of Mezzanine Lender's loan amount had been lent to Developer years earlier to acquire the Project land; there were no un-dispersed funds in the mezzanine loan as of 2008). SUMF, ¶¶ 6, 21, 25.

In late 2007 (but prior to an actual Developer default on either Project loan), Mezzanine Lender developed an action plan designed to protect its financial interest in the Project, should a

default on the mezzanine loan occur. SUMF, ¶ 30. If Senior Lender foreclosed on its security in the Project, Mezzanine Lender's lower priority security interest would have been extinguished. Mezzanine Lender planned to take actual control of the Project by foreclosing on the mezzanine loan upon a default by Developer. SUMF, ¶ 30. In accordance with the action plan, Mezzanine Lender would inject further capital into the Project to pay for completion of the Project. SUMF, ¶ 30. The action plan contemplated certain concessions by the Senior Lender connected with the Project, such as extending the maturity date of the senior loan, Senior Lender funding the remainder of its construction loan, and Senior Lender agreeing to allow proceeds from the Project (i.e., from condominium sales) to go to Mezzanine Lender in come capacity (as opposed to all proceeds flowing directly to Senior Lender as a result of its first priority position). SUMF, ¶ 30. Senior Lender, however, balked at Mezzanine Lender's plan because Senior Lender would only allow Mezzanine Lender to foreclose on the equity in the Project. SUMF, ¶ 30. As a result, Mezzanine Lender's late 2007 action plan never came to fruition. SUMF, ¶ 30.

Instead, in January 2008, Developer finally missed its monthly interest payment to Senior Lender on the senior loan, and Developer was placed in default by Senior Lender. SUMF, ¶ 31. Developer's default on the senior loan also constituted a default on the mezzanine loan, and Mezzanine Lender also placed Developer in default. To stave off an inevitable foreclosure by Senior Lender, Mezzanine Lender acted to protect its interest by instituting a series of protective advances—an act contemplated, but not required, by the mezzanine loan agreement. SUMF, ¶ 31-33. The protective advances paid by Mezzanine Lender bought time. Mezzanine Lender needed that time to evaluate, among other things, the status of construction, the probability that various prospective buyers would close on units under contract, the likely sales prices and recoveries related to condominium sales, and its position in the "capital stack"—an analysis of

where Mezzanine Lender's $43 Million loan stood in priority compared with Senior Lender's far greater loan and the anticipated value of the Project at completion. SUMF, ¶ 32-33. Foreclosure and assumption of the construction contract is a significant step for a lender. Before taking such a drastic step, the lender will want to, and is entitled to, assess the condition of the project (both financially and physically) and assess the likelihood of future recovery and value. Such an analysis was particularly important for Mezzanine Lender, who was second in priority behind a $146.3 Million loan from Senior Lender.

In late June to early July 2008, Developer, Senior Lender, and Mezzanine Lender entered into a series of agreements related to the Project, including a forbearance agreement between Developer and Mezzanine Lender (the "Forbearance Agreement") and an Intercreditor Agreement between all three parties. SUMF, ¶ 33-37. Pursuant to the Forbearance Agreement, Mezzanine Lender had the option, but not the obligation, to pay for certain items as protective advances. SUMF, ¶ 35. Developer, however, agreed that it was responsible for paying Walton for any construction costs above the unfunded loan amount of Senior Lender. SUMF, ¶ 35. These agreements also established a mechanism for condominium unit sales to return money to the lenders in a formulaic way. SUMF, ¶ 37. Mezzanine Lender was to receive no return or proceeds until the 127th unit sold. SUMF, ¶ 37. Less than 127 units were sold before the Bankruptcy proceeding began; Mezzanine Lender received no money from these condominium sales. SUMF, ¶ 37.

The process contemplated by the Forbearance Agreement, however, came to a screeching halt just weeks after execution. Around the time that Developer and the lenders entered into the Forbearance Agreement, the consultant retained by the lenders to assess closings and unit sale prices returned a dire report, suggesting that many less units would close than expected and for a

much lower price than necessary to make the continued forbearance situation possible. SUMF, ¶ 38. Mezzanine Lender decided to not make any protective advances after August 2008, which was Mezzanine Lender's sole option pursuant to the terms of the Forbearance Agreement. SUMF, ¶ 33. By early September, the Forbearance Agreement and related Intercreditor Agreement were irrelevant, as Senior Lender acted to foreclose on the Project. SUMF, ¶ 39. Developer granted Senior Lender a deed-in-lieu of foreclosure, the Project was transferred to an affiliate of Senior Lender called Laketown Wharf Marketing Corporation (which expressly assumed the construction contract with Walton), and Laketown Wharf Marketing Corporation filed for Chapter 11 Bankruptcy protection. SUMF, ¶ 39; *In re: Laketown Wharf Marketing Corp.*, No. 08-40692-LMK (Bankr. N.D. Fla., filed September 29, 2008).

Following the institution of the Project's Bankruptcy case, Senior Lender (a large construction lender with a significant portfolio of loans on troubled assets like the Project) failed and was placed in Federal Deposit Insurance Corporation receivership. *See* Walton's Adversary Proceeding, No. 09-04002-LMK, filed January 9, 2009, Doc. 63. Downstream secured creditors (including Mezzanine Lender with its second priority position on its over $53 Million in loans and protective advances) and unsecured creditors faced little chance for any positive recovery, and ultimately received none.[3] Walton, persistent in its belief that it was owed money on the

---

[3] The Senior Lender portfolio of loans and associated assets, which totaled over $2.5 Billion and included the Project, was ultimately sold to a group of four investors. One of those entities that now owns an interest in the Senior Lender portfolio of assets is an opportunity fund of Starwood Capital Group that is separate and apart from the opportunity fund that originally invested in the Project via the mezzanine loan. *See* Dep. Trans. of James Kane (Starwood Capital Group's 30(b)(6) corporate representative), p. 126, l. 6 – p. 127, l. 16. The later investment in the Senior Lender portfolio of assets (a $2.5 Billion group that just happened to include the Laketown Wharf asset) had no relationship to the prior loan on the Project, did not protect the investors in the prior opportunity fund from losses associated with the Project's mezzanine loan, and was simply a subsequent arms-length business transaction that coincidentally involved parties with a business and nomenclature relationship. *Id.* Notably, the Project was sold at auction pursuant to Bankruptcy procedure, and the Project was sold free and clear of all liens, claims, encumbrances, and interests. *See In re: Laketown Wharf Marketing Corp.*, No. 08-40692-LMK (Bankr. N.D. Fla., filed September 29, 2008), Doc. 758 (Order Confirming Chapter 11 Plan of Liquidation), p. 11.

Project, sought to recover any amount from any entity associated with the Project—proceeding

to request payment from Senior Lender for the same amounts it seeks in this Action from

Mezzanine Lender, and pursuing claims against Developer, Senior Lender, and the Project

property in Bankruptcy.[4]

In June 2011, Mezzanine Lender's sole member, SOF-VI U.S. Holdings II, LLC wrote-

off a complete loss on the Project, totaling some $62,906,000. This figure includes the entire

$43 Million loan made by Mezzanine Lender for the Project, over $11 Million in protective

---

[4] Notably, in August 2009, Walton sued Senior Lender in an Adversary Proceeding for quantum meruit and tortious interference with a contractual relationship on underlined identical allegations to those contained in Walton's First Amended Complaint against Mezzanine Lender and the Starwood defendants. *See* Walton's Adversary Proceeding, No. 09-04002-LMK, filed January 9, 2009, Doc. 53. Paragraphs 14-24 of Walton's Adversary Proceeding Third Amended Complaint are essentially the same as Paragraphs 14-27 of Walton's First Amended Complaint in this case. *Compare id.* with Doc. 18. Walton also sought payment for its construction work on the Project—the exact damages it seeks from the Defendants in this case from the Project by pursuing two claims in Bankruptcy—one on Walton's $9 Million third mortgage (*In re: Laketown Wharf Marketing Corp.*, No. 08-40692-LMK , Claim No. 392-1) and one on Walton's September 9, 2008 lien on the Project (*In re: Laketown Wharf Marketing Corp.*, No. 08-40692-LMK, Claim No. 393-1), which established a claim by Walton for $8,426,563.03 for all work Walton performed on the Project up to September 8, 2008 (including all times that Walton now alleges it believed it was working on the Project with expectation of payment from Defendants as opposed to Developer or Senior Lender). Remarkably, Walton, as part of the Chapter 11 Liquidation Plan approved by the Bankruptcy Court in *In re: Laketown Wharf Marketing Corp.*, No. 08-40692-LMK, received a payment of $150,000 as "**full and complete satisfaction**" of its claims against Senior Lender and claims against the Project property, including both third mortgage and lien claims—though Walton, by virtue of its junior secured and unsecured positions, was entitled to no distribution in Bankruptcy. *See In re: Laketown Wharf Marketing Corp.*, No. 08-40692-LMK, Docs. 714 (amended Chapter 11 Liquidation Plan) (quoting from ¶ 4.2 with emphasis added), 758 (Court approval of same); Walton's Adversary Proceeding, No. 09-04002-LMK, filed January 9, 2009, Doc. 123 (stipulating dismissal of Adversary Proceeding against Senior Lender *with prejudice* as part of settlement agreement contained in Chapter 11 Plan). Thus, the Court finds itself with a Plaintiff who asserted a lien against the Project claiming it was owed over $8 Million for work performed up until September 8, 2008 (which includes all of the time period of costs Walton now seeks against Defendants in this case), who sought recovery from Senior Lender in Bankruptcy for the exact same factual claims it now asserts against Mezzanine Lender, who sought the same recovery—for the costs of its work on the Project—from the Bankruptcy debtor (an affiliate of Senior Lender who expressly assumed the obligations of Developer and the Construction Contract), and who received a payment above what it was legally entitled to in full and complete satisfaction of all claims stated above in this sentence, including claims for all of the costs of its work on the Project, yet Walton continues to pursue Mezzanine Lender, who lost underlined everything (over $52 Million) and received nothing from the same Bankruptcy proceeding, and Starwood Capital and Starwood Asset, neither of whom lent money to the Project or had any contractual relationship with any entity associated with the Project, other than a relationship as a related company to Mezzanine Lender. The only reason Walton was able to proceed with its identical claims against Defendants in this separate action is that Walton's action against Senior Lender was stayed due to FDIC receivership and the Bankruptcy Court "withdrew the references" to the Defendants in the Adversary Proceeding Third Amended Complaint into this Action. *See* Doc. 4.

advances made by Mezzanine Lender in 2008, and an additional approximately $9 Million in legal fees and unpaid interest chargeable to Developer under the loan agreement for the Project that was lost by Mezzanine Lender. Because Mezzanine Lender lost <u>everything</u> that it invested in the Project, so too did investors in the Starwood Capital Group opportunity fund that invested in Mezzanine Lender. SUMF, ¶ 46. Starwood Capital itself lost any investment or interest it had in the Project as a result of Mezzanine Lender's mezzanine loan. SUMF, ¶ 46. Starwood Asset, which had no direct financial interest in the Project, also received no return or financial gain from Mezzanine Lender's complete loss on the loan. SUMF, ¶ 47.

Walton has sued Mezzanine Lender, Starwood Capital, and Starwood Asset to recover amounts it alleges it spent for construction costs on the Project, pursuant to theories of quantum mertuit (alleging that Walton provided the Defendants a "benefit" by increasing the value of the Project), tortious interference (alleging that Defendants interfered improperly with the Construction Contract and Walton's relationship with Developer), and fraud (alleging that each of the Defendants specifically agreed to pay Walton for its work on the Project directly). As discussed below, the undisputed material facts and applicable law demonstrate that Walton cannot recover from Defendants on any of these claims, and that Defendants are entitled to summary judgment against Walton in this Action.

## III.   LEGAL ARGUMENT AND DISCUSSION.

### A.   SUMMARY JUDGMENT STANDARD.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In determining

the existence of a genuine issue of material fact, the [court should view] the facts in a light favorable to the non-moving party, with the moving party bearing the burden of demonstrating the lack of a genuine issue." *McClendon v. United States*, 2007 WL 1804528, No. 1:06-cv-00021-MP-AK, *1 (N.D. Fla. June 20, 2007). If the movant successfully discharges this burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, the existence of a genuine issue of material fact. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). "Rule 56(e) therefore requires the nonmoving party to go beyond the pleading and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### B.   WALTON'S QUANTUM MERUIT CLAIM FAILS BECAUSE WALTON CONFERRED NO BENEFIT ON ANY OF THE DEFENDANTS.

Walton's work provided no benefit to Mezzanine Lender, whose entire investment in the Project was completely lost, or the related Starwood defendants (who benefited in no way because Mezzanine Lender lost everything), and Walton's quantum meruit claim fails. Under Florida law, to recover on a quantum meruit (or unjust enrichment) claim, the plaintiff must prove that (1) the plaintiff provided a benefit to the defendant; (2) the defendant assented to and received the benefit; and (3) the circumstances are such that, "in the ordinary course of common events," a reasonable person would expect to pay for the benefit, or, in other words, that it would be unjust for the defendant to retain the benefit without compensation to the plaintiff. *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 305 (Fla. 1st DCA 1999) (*citing Osteen v. Morris*, 481 So. 2d 1287, 1290 (Fla. 5th DCA 1986). In order for a court to allow a claim for quantum meruit to proceed, the plaintiff must clearly allege and prove the existence of the <u>benefit</u> conferred on the defendant. *See, e.g., Absolute Marine Towing &*

*Salvage, Inc. v. S/V Iniki*, 2010 WL 2652466, No. 6:09-cv-1712-ORL-31KRS, *2 (M.D. Fla. June 22, 2010) ("Count III fails to state a claim for quantum meruit [because] it is not clear that Absolute Marine conferred a benefit on Markel, as there is nothing that "flowed to" Markel, under these facts.").

In the context of a lender holding a mortgage on a property, a contractor's improvement to such property is not legally a "benefit" conferred on that lender unless the lender has a present right to possess the collateral. *See Belfour USA Group, Inc. v. Bray & Gillespie, LLC*, 2008 WL 276022, No. 6:05-cv-1624-Orl-19UAM, *7-*8 (M.D. Fla. Jan. 31, 2008). "Florida law does not recognize the mere increase in the value of collateral as a direct benefit in claims for unjust enrichment unless the defendant has a present right to possess the collateral." *Id.* at *8 (citing *E & M Marine Corp. v. First Union Nat'l Bank*, 783 So.2d 311, 312-13 (Fla. 3rd DCA 2001); *Coffee Pot Plaza P'ship v. Arrow Air Conditioning & Refrigeration, Inc.*, 412 So.2d 883, 883-84 (Fla. 2nd DCA 1982)). In other words, "[i]mprovements to a property in which a defendant has a security interest are not considered direct benefits unless the defendant has a present right to possess the property." *Id.* at *7. Thus, for Walton to prove a benefit that it provided to Mezzanine Lender under Florida law, it must show some benefit other than increased value of the Project asset itself.

In *Coffee Pot Plaza*, the plaintiff (Arrow Air) installed and repaired meat lockers and related refrigeration equipment for a tenant (Gulf Shores) of defendant (Coffee Pot Plaza). Gulf Shores (operating a meat market in a retail space leased from Coffee Pot Plaza) did not pay Arrow Air, and Arrow Air sued Coffee Pot Plaza for unjust enrichment. The District Court of Appeal of Florida, Second District, reversed the judgment in favor of Arrow Air, holding that Arrow Air could not recover from Coffee Pot Plaza pursuant to a theory of unjust enrichment.

The Court first held that Coffee Pot Plaza did not request that Arrow Air perform the repair work and thus, "it cannot be said that Coffee Pot knowingly and voluntarily accepted the benefits of Arrow's work since it did not come into control of the equipment until after Arrow had completed the work and only then because it was forced to terminate Gulf Shores' lease." *Id.* The Court further noted, "Arrow contracted with Gulf Shores to do the work, and it must look to Gulf Shores for payment." The Court second held (most relevant to this Motion) that the judgment must be overturned because Arrow Air did not provide a direct benefit to Coffee Pot Plaza: "While the repairs no doubt enhanced the value of the equipment, it is speculative to say that any benefit has come to Coffee Pot since Coffee Pot did not receive its rental payments from Gulf Shores and has been unable to find a new tenant for its store." *Id.*

Walton's cause of action for quantum meruit fails because Walton never provided any benefit to any of the Defendants. Mezzanine Lender lost all of the money that it lent to Developer for the Project and all of the money it spent in 2008 on protective advances in an attempt to prevent the Senior Lender from foreclosing on its loan and wiping away Mezzanine Lender's security in the Project. SUMF, ¶¶ 44-45. The Project ultimately was foreclosed on by Senior Lender and ended up in Bankruptcy. Mezzanine Lender received no Bankruptcy distribution and no proceeds from any condominium unit sales. SUMF, ¶¶ 37, 44. As in *Coffee Pot*, any allegation by Walton that any Defendant received a benefit from its work is purely speculative, as no Defendant made any money from an interest or was paid back on any investment in the Project—a fact Walton does not and cannot dispute.

Moreover, the "benefit" Walton alleges it provided was an asset with increased value that it believes ended up in the hands of Mezzanine Lender or some related entity. SUMF, ¶ 48. As discussed above, increased value of an asset is not a legally recognized benefit on which a

quantum meruit claim can be based on Florida.  It is undisputed that Mezzanine Lender did not

foreclose on its debt or the equity in the Project; therefore, Mezzanine Lender did not have any

right to possess the Project collateral at any time relevant hereto.  Any other alleged "benefit"

that Walton may assert it provided (such as reduced risk of foreclosure, return on investment, or

proceeds from unit sales) are unsupported by the facts, as each such alleged benefit is related

solely to the true benefit Walton alleges—increased value of the Project—and the undisputed

facts show that no Defendant received any such benefit.  Finally, because Mezzanine Lender lost

its entire investment in the Project, Walton cannot claim that Starwood Capital or Starwood

Asset benefited in any way from Walton's work on the Project.  Because Walton provided no

legally-recognized or actual benefit to the Defendants by its work on the Project, the Defendants

are entitled to summary judgment on Walton's quantum meruit claim.

### C.   THE FLORIDA STATUTE OF FRAUDS BARS WALTON'S TORT CLAIMS FOR FRAUD AND TORTIOUS INTERFERENCE.

Walton alleges that Mezzanine Lender, and Starwood Asset and Starwood Capital, made

fraudulent promises to Walton that, if Walton continued its work on the Project, then "the

Starwood Defendants would process and pay Walton's payment applications for the Project

work." 1st Am. Compl. at ¶ 62.  Walton further alleges that the Defendants tortiously interfered

with the Construction Contract by taking over for Developer, controlling Developer payments,

and dealing directly with Walton.  It is undisputed that Walton's work on the Project was

performed pursuant to the Construction Contract with Developer.  SUMF, ¶¶ 3, 42.  If Walton

was owed money related to its work on the Project, Developer was the responsible party for

paying such money.  As a result, Walton's tort allegations are based on (1)  an alleged promise to

pay for the debts of another (that the Defendants agreed to pay Walton for amounts owed by

Developer) and (2) Walton's position that Defendants took over responsibilities of Developer

that were set forth in the Construction Contract and somehow controlled payments to Walton by Developer.

The Florida Statute of Frauds squarely addresses such allegations.[5] "No action shall be brought . . . whereby to charge the defendant upon any special promise to answer for the debt, default, or miscarriage of another person" unless the promise is in writing and signed by the party to be charged. F.S.A. § 725.01; *see also Riba v. Pila*, 543 So. 2d 429, 430-31 (Fla. 2d DCA 1989) (holding alleged oral promise to pay the debt of another unenforceable because not in writing); *Al Booth's, Inc. v. Boyd-Scarp Enters., Inc.*, 518 So. 2d 422, 423 (Fla. 5th DCA 1988). In addition, torts related to claims concerning interests in real property may be barred by the Florida Statute of Frauds. *See* F. S. A. § 725.01; *see also Wharfside at Boca Pointe, Inc. v. Superior Bank*, 741 So.2d 542 (Fla. 4th DCA 1999) (affirming summary judgment for lender on tortious interference claim related to agreement concerning interest in real property, subject to Florida Statute of Frauds at Section 725.01). The Statute of Frauds will bar a tort claim that is simply an attempt to recover from a party pursuant to an unenforceable contract. *See Roberts Co., Inc. v. P.B.O. Ltd.*, 322 So.2d 633, 633-34 (Fla. 3d DCA 1975) ("The tortious conduct alleged in count II is predicated upon defendant's breach of an oral promise to convey realty and the Statute of Frauds has been held to bar such tort actions and, in essence, these actions are an attempt to recover for breach of an unenforceable contract.").

Walton admits that Mezzanine Lender did not agree to pay Walton directly for the debts of Developer pursuant to any written agreement. SUMF, ¶¶ 40-42. Walton further agrees that

---

[5] In the Motion to Dismiss, Defendants raised the Statute of Frauds as a basis for dismissing Walton's quantum meruit cause of action, which the Court found unpersuasive. *See* Doc. 31, p. 13. Defendants, however, did not raise the Statute of Frauds in connection with Walton's tort theories, the Court did not consider the Statute of Frauds with respect to Defendants' prior motion to dismiss Walton's tort claims, and Defendants herein raise the Statute of Frauds as a bar to Walton's tort claims for the first time.

Mezzanine Lender did not take over the Project or assume the obligations of the Construction Contract pursuant to a written agreement. SUMF, ¶¶ 40-42. Instead, Walton attempts to assert tort causes of action against Mezzanine Lender, and the related Starwood defendants, based on allegations of oral statements, and certain unwritten actions. These causes of action are precisely the types of action the Statute of Frauds is designed to prevent. If any Defendant agreed to take on the debts of Developer, such an agreement must be in writing pursuant to the Statute of Frauds. If any Defendant "took over" the Construction Contract from Developer vis-à-vis Walton, such an agreement to "step into the shoes" of Developer must be in writing pursuant to the Statute of Frauds. Notably, Walton agreed from the beginning of the Project that it would only look to Mezzanine Lender to fulfill the obligations of Developer under the Construction Contract pursuant to certain <u>written</u> steps, yet Walton now sues for tortious interference based on actions without a corresponding writing.

Because the actions Walton alleges Mezzanine Lender, and the Starwood defendants, took with respect to Walton that give rise to Walton's tortious interference claim and fraud claim are actions that must be recorded in or based on a written document between the parties, the Defendants are entitled to summary judgment on these tort claims.

### D.   WALTON'S RELIANCE ON ANY ALLEGED STATEMENTS BY A DEFENDANT WAS NOT JUSTIFIED IN LIGHT OF WALTON'S PRIOR AGREEMENT AND UNDERSTANDING RELATED TO LENDER OBLIGATIONS.

As noted above, Walton has sued these Defendants for fraud, based solely on statements Walton alleges were made regarding promises to pay Walton for its work on the Project. In order to maintain its action for fraud, Walton must prove that it not only relied on such alleged statements (assuming first that Walton can even prove specific statements were made sufficient to constitute a fraudulent misrepresentation) but also that Walton was <u>justified</u> in relying on such

alleged statements.  Walton's justifiable reliance must be considered in the context of the Project circumstances, prior written agreements, and the relationship of the various parties.  In short, Walton understood from the beginning of the Project that Mezzanine Lender was just a lender and that, absent a greater obligation undertaken in writing, Mezzanine Lender would not be responsible for the obligations of the party with whom Walton contracted to build the Project: Developer.  SUMF, ¶¶ 7-8.  Despite this understanding and the undisputed lack of any such written assumption of a greater obligation by Mezzanine Lender, Walton now seeks a multi-million dollar recovery from Mezzanine Lender, and the other Starwood defendants, on the basis of alleged oral promises that Walton states it relied on.  If such statements or promises were made, Walton's reliance on such statements or promises was not justified when Walton knew that Mezzanine Lender had not expressly assumed the obligations of Developer in writing.

For Walton to recover against Mezzanine Lender and the Starwood defendants for fraud, Walton must prove that it justifiably relied on some statement by a defendant.  *See Simon v. Celebration Corp.*, 883 So.2d 826, 832 (Fla. 5th DCA 2004) (stating essential elements to fraud claim).  The Florida Supreme Court has examined the concept of justifiable reliance as follows: "The question ... is whether the recipient of the misrepresentation is 'justified in relying upon its truth.'  For if the recipient 'knows that it [the statement] is false or its falsity is obvious to him,' his reliance is improper, and there can be no cause of action for fraudulent misrepresentation." *M/I Schottenstein Homes, Inc. v. Azam,* 813 So.2d 91, 94-95 (Fla. 2002) (quoting *Besett v. Basnett,* 389 So.2d 995, 997 (Fla. 1980)) (citations omitted).  Florida law recognizes that a construction lender must undertake specific steps to take over for a developer and incur liability to the contractor—including foreclosure and actually completing construction.  *See Chotka v. Fidelco Growth Investors*, 383 So.2d 1169, 1170 (Fla. 2nd DCA 1980) (Lender "became more

than just a lender when they took title to the condominium project, completed construction, and, holding themselves out to be the developer and owner of the project, advertised and sold units to purchasers."). When the contractor agrees from the outset as to those specific steps a lender must take, that contractor is not justified in relying on oral statements in opposition to the arrangement it agreed to and understood from the beginning.

At the time Walton entered into the Construction Contract with Developer concerning the Project, Walton also executed two documents wherein Walton expressly consented to an assignment of the Construction Contract as collateral for the Developer's two loans for the Project.[6] SUMF, ¶ 7. In the consent related to Mezzanine Lender (referred to herein as the "Consent and Agreement") Walton, at the very beginning of the Project, agreed to what it would do regarding the Project lenders if Developer defaulted on its obligations to Walton—such as failing to pay Walton for sums owed pursuant to the Construction Contract:

> Contractor [Walton] agrees to look solely to Borrower [Developer] for the performance of all of the obligations under the Construction Contract. . . . In the event of a default under the terms of the Construction Contract ("**Construction Contract Default**") or any other event granting the Contractor the right to terminate or suspend performance thereunder, Contractor will deliver **written notice** to [Mezzanine] Lender thereof simultaneously with delivery of notice (whether written or oral) thereof to Borrower. Within fifteen (15) days after receipt of such written notice from Contractor, Lender shall advise Contractor whether Lender intends

---

[6] Walton based its contract-based cause of action in the First Amended Complaint (Count II) in part on this document, referred to as the "Consent." Doc. 18, ¶¶ 44-51. The Court previously dismissed this count of Walton's First Amended Complaint, noting, *inter alia*:

> The Consent was not a bilateral agreement between Plaintiff and [Mezzanine Lender] but rather a unilateral acknowledgement of the rights [Mezzanine Lender] could exercise in the event of [Developer's] default. [Mezzanine Lender] was not bound to assume [Developer's] obligations and did not sign the document. Since Plaintiff fails to allege and acknowledges that there is no express written assumption by [Mezzanine Lender] of the obligations of [Developer], this Count cannot survive Defendants' Motion to Dismiss . . . .

Doc. 31, p. 14-15 (citations omitted).

> to exercise its right to sure such Construction Contract Default or
> cause such Construction Contract Default to be cured.   To the
> extent Lender makes such election, Lender shall have then have
> [sic] the right, but not the obligation, for a period of thirty (30)
> days after such election, to cure such Construction Contract
> Default or cause such Construction Contract Default to be cured.

SUMF, ¶ 8; Doc. 18-2, p. 2 (bold emphasis in original; bold and underline emphasis added).

Walton also, pursuant to the Consent and Agreement, understood Mezzanine Lender's

obligations in the event of Developer's default on the mezzanine loan:

> Upon the occurrence of an Event of Default under the Loan
> Agreement, Lender shall have the right, **upon written notice to
> Contractor**, to terminate the Construction Contract, in which
> event, Contractor shall have a claim for payment for the amounts
> as provided in the Construction Contract . . .  If Lender does not
> elect to terminate the Construction Contract in accordance with the
> foregoing, after the occurrence of any Event of Default under the
> Loan Agreement, and if Lender elects to complete construction of
> the Project (or any part thereof), Contractor shall, **upon written
> request of Lender**, provide Services to Lender (or its successors
> or assigns) under the terms of the Construction Contract . . . .

*Id.* (emphasis added).  Furthermore, Walton expressly consented to what the liability of

Mezzanine Lender would be with respect to the Construction Contract:

> Nothing contained in the Construction Contract or this [Consent
> and] Agreement shall  .  .  .  obligate Lender to make any
> disbursement under the Loan Agreement in a manner other than
> that contemplated by the Loan Agreement or provide Contractor
> with any right to require such disbursement [or] impose any
> liability on Lender or obligate Lender to perform any of
> Borrower's obligations under the Construction Contract, except to
> the extent that such liability or obligations are **expressly assumed
> by Lender in writing**.

*Id.*, p. 3 (emphasis added).  Walton executed an identical consent and agreement document

related to Senior Lender.  Notably, the Construction Contract itself mirrored this language, and

Walton specifically agreed in the Construction Contract that it would execute documents similar

in substance to the Consent and Agreement and, in the event of a Developer default to Walton,

perform its work for either Project lender, "if the Owner's [Developer's] lender shall agree to pay the Contractor . . . and shall agree **in writing** to perform all obligations of the Owner . . . ." Doc. 18-1 (Construction Contract), § 14.6.2 (emphasis added).

Though Walton was not being paid by Developer in May 2008 (and though Walton sent a notice of nonpayment to Developer on May 21, 2008 <u>without copying either Project lender</u>), Walton did not send Mezzanine Lender the written notice it expressly agreed to send in the event of Developer's default under the Construction Contract until September 12, 2008. SUMF, ¶¶ 24-28. Mezzanine Lender did not respond to Walton's September 12, 2008 letter. The Project was in Bankruptcy by the time a response was required. SUMF, ¶ 39. The written correspondence Walton received related to its notice was from Senior Lender only. SUMF, ¶ 29.

It is undisputed that Mezzanine Lender never sent and Walton never received a written notice that Mezzanine Lender intended to take over the liability or obligations of Developer under the Construction Contract pursuant to an express assumption. SUMF, ¶ 40-42. Mezzanine Lender never requested in writing that Walton perform its services contemplated by the Construction Contract for or to the Mezzanine Lender. SUMF, ¶ 41. Walton had previously agreed that, absent such writings, it would not look to Mezzanine Lender to fulfill the obligations of Developer, cure the defaults of Developer, or disburse any money to it or Developer. SUMF, ¶ 8. Knowing that no such writings existed (and failing to fulfill its own agreement to notify the lenders in writing if Developer was in default so that the lenders could properly respond in accordance with the two loan agreements, the Construction Contract, and the two Walton consent and agreement documents), Walton certainly understood that any statements to the contrary by any representative of Mezzanine Lender were of no import or consequence. If Walton relied on such alleged statements, it did so without a legal justification.

Notably, despite the positions taken by Walton in this lawsuit, its contemporaneous actions confirm its understanding at the time of the continuing relationship between Walton and Developer.[7]  SUMF, ¶¶ 26-27, 42.  Even if the statements were made by Jeff Morris and Byron Hayes exactly as Walton has testified, Walton was not justified in relying on such statements when Walton had previously agreed to and understood the terms of the Consent and Agreement. Defendants are entitled to summary judgment on Walton's claim of fraud.

### E.   WALTON'S CLAIM FOR TORTIOUS INTERFERENCE FAILS BECAUSE THERE IS NO EVIDENCE OF MEZZANINE LENDER INTERFERENCE WITH THE CONSTRUCTION CONTRACT AND MEZZANINE LENDER PROPERLY EXERCISED ITS RIGHTS WITH RESPECT TO WALTON.

Walton has sued the Defendants for tortious interference with a contractual relationship. Walton alleges, in the First Amended Complaint, that the Defendants (apparently all of them without regard for which entity was the actual lender on the mezzanine loan) controlled

---

[7] Steve Ellis, Walton's 30(b)(6) corporate representative, testified as follows on behalf of Walton:

> Q.   Was there ever a point in time when Walton submitted project correspondence in the form of letters directly to a Starwood entity or representative, without copying Laketown Wharf, LLC?
> A.   I personally did not.  I don't know about anybody else.
> Q.   Why wouldn't you, if you understood that a Starwood entity was going to be paying Walton directly for its work?  Why would you continue to include Laketown Wharf, LLC, on correspondence?
> A.   Because we had the contract with Laketown Wharf.
> Q.   **Did you understand throughout 2008 that Walton was still working under a contract for Laketown Wharf, LLC?**
> A.   **Yes.**
> Q.   As Walton continued to perform work on the Laketown Wharf project, Walton continued to submit payment applications to Laketown Wharf, LLC?
> A.   That's correct.
> Q.   Did Walton ever submit any payment applications directly to any Starwood entity?
> A.   No.
> Q.   Why not?
> A.   Because we had the contract with Laketown Wharf.  **We believed that Starwood would pay us through Laketown Wharf,** until they bankrupted him or whatever they did to him.

Dep. Tr. of Steve Ellis, p. 128, l. 10 – p. 129, l. 12 (emphasis added).

Developer's payments to Walton, directed Developer not to pay Walton, directed Walton

regarding how to perform its work, and negotiated with Walton regarding change orders and

time extension requests (as noted above in Footnote 4, Walton has actually alleged that Senior

Lender did the <u>exact same things</u>).  Doc. 18, ¶ 56.  No evidence has been presented that

Mezzanine Lender, or either of the other Starwood defendants, actually controlled payments

from Developer to Walton.  Notably, throughout 2008, Mezzanine Lender had no amounts in the

mezzanine loan unfunded and had no contractual obligations to provide Developer with any

money to fund anything related to the Project.  SUMF, ¶¶ 6, 21, 25.  Walton understood that

Developer had no money in 2008 to pay Walton without funding from a lender (and the only

lender with unfunded commitments in 2008 was Senior Lender); therefore, any argument by

Walton that Mezzanine Lender dictated whether Developer paid Walton in 2008 is spurious.

SUMF, ¶¶ 21, 25.  Moreover, the actions Walton complains of undertaken by Mezzanine Lender

or employees of a Starwood defendant on behalf of Mezzanine Lender, were permissible and

appropriate actions by a lender to understand the condition (both financially and physically) of

an asset in which it had a multi-million dollar security interest.

  A party "has a privilege to interfere with a contractual or business relationship, where the

interference is necessary to protect his own contractual rights provided that such interference is

without malice." *Nitzberg v. Zalesky*, 370 So.2d 389, 391 (Fla. 3rd DCA 1979).  "[T]here can be

no claim where the action complained of is undertaken to safeguard or promote one's financial

or economic interest." *Genet Co. v. Annheuser-Busch, Inc.*, 498 So. 2d 683, 684 (Fla. 3d DCA

1986) (*citing Bruce v. Am. Dev Corp.*, 408 So. 2d 857, 858 (Fla. 3d DCA 1982)).  As noted by

the Court in its Order on Defendants' Motion to Dismiss, a party that is not a stranger to a

contractual relationship, like Mezzanine Lender's relationship to Walton's contractual

relationship with Developer, can only be liable for tortious interference when the interference

alleged was "done for an improper purpose." Doc. 31, p. 17 (citing *Morsani v. Major League*

*Baseball*, 663 So.2d 653, 657 (Fla. 2nd DCA 1995)).

      The Florida courts have not squarely addressed a situation such as the instant one where

an unpaid contractor sues a construction lender who has not expressly assumed the construction

contract in tort for alleged actions the lender took related to the construction project.  A recent

case in Massachusetts, however, is illustrative.  In *Creative West Architects, LLC, et. al., v.*

*Downtown Natick Development Company, LLC, et. al*, 2011 WL 2477257, No.

MICV200904513A (Mass. Super. April 14, 2011), architects (Creative West and CWA) not paid

by a construction project's owner (DNDC) for architectural services provided for a condominium

project sued the project's construction lender (Needham Bank) to recover under theories of

mechanics lien, accounting, intentional interference with contractual relations, and lender

liability under the instrumentality theory.  *Id.* at *1.  When the owner DNDC failed to make

interest payments to the lender Needham Bank, the bank declared the borrower in default and

ultimately "assumed final decision making authority on construction decisions" related to the

project.  *Id.* at *2.  Needham Bank eventually foreclosed on the property, directly paid

contractors and subcontractors involved in the construction for DNDC, and hired its own

architects and contractors to assist with completing the project and selling condominium units.

*Id.* at *2-*3.  The Superior Court of Massachusetts first dismissed plaintiffs' instrumentality

lender liability claim, noting that "[t]o impose liability on facts like those present here would

impair the value of collateral and chill the extension of credit for housing projects."  *Id.* at *4.

The court next dismissed the plaintiff's intentional interference claim, with reasoning widely

applicable to the facts of this dispute:

The claim of intentional interference with contractual relations fails for many reasons, including the express reference in the plaintiffs' contracts to the Bank's senior secured interests. It is difficult to conceive of a claim for interference with a contract by a senior creditor whose status as such is squarely recognized in the only relevant contracts.

More fundamentally, the Bank cannot be held liable for employing legitimate means to act to protect its interests upon default, in the absence of improper motive. The Bank had no contractual, fiduciary or other obligations to the plaintiffs. Acting in its own interests as secured lender was not improper in means or motive. . . . The suggestion that the Bank actually wanted to injure the plaintiffs is entirely speculative. The facts do not support a reasonable inference of improper motive, particularly where the Bank's first mortgage placed it in a senior position in all respects, such that it stood to gain nothing from the plaintiffs' loss.

Finally, the Bank did not commit any act amounting to interference with the contract itself, as opposed to assertion of rights secured by the Bank's mortgage interests. . . . The Bank's acts in its own interest in no way promoted DNDC's breach of the contracts. DNDC's lack of funds did that.

*Id.* (citations omitted).

Similar to the bank in *Creative West* (though certainly less "controlling" because Mezzanine Lender did not foreclose on the Project and take ownership, did not hire its own contractors and subcontractors to complete the Project, and did not directly pay entities that provided construction services to the Project, such as Walton), Mezzanine Lender acted consistently with a lender trying to assess and preserve a secured interest in a distressed asset.[8] Like the lender in *Creative West*, Mezzanine Lender was recognized in the Construction Contract and the Consent and Agreement by Walton as a party with certain rights, including Walton's

---

[8] Such actions are entirely consistent with Florida law regarding lender liability. *See, e.g., Comet Dev. Corp. v. Prudential Ins. Co. of Am.*, 579 So. 2d 355, 355 (Fla. 3d DCA 1991) (regarding a construction project, "if [the lender] owed any duty, it was to the owner of the building, not appellant contractor") (internal citation omitted); *Strickland-Collins Constr. v. Barnett Bank of Naples*, 545 So. 2d 476, 477 (Fla. 2d DCA 1989) (holding that the construction lender's duty was to the owner, not the general contractor).

specific agreement to "[m]ake the site of the Work available at reasonable times for inspection by the Owner's [Developer's] lender or the Owner's lender's representatives" and to "[p]romptly furnish the Owner with information, documents, and materials that the Owner may reasonably request from time to time in order to comply with the requirements of Owner's lender." Doc. 18-1 (Construction Contract), § 14.6.2.

In short, the acts Walton complains of that Mezzanine Lender undertook towards Walton, such as negotiating change orders Walton proposed on the Project at the request of Walton, reviewing the progress of Walton's work on the Project, having representatives and consultants review and approve Walton's work in connection with Developer representatives, and meeting with Walton to understand payments made for construction work and to complete a forensic audit, were not done with an improper purpose. Instead, Mezzanine Lender acted to understand and assess the condition of the asset in which Mezzanine Lender had an over $50 Million secured financial interest. Such actions were also not undertaken in an improper way, since those actions were via methods specified in the Construction Contract, were requested by Walton, or are allowed by courts. Like the lender in *Creative West*, Mezzanine Lender's actions were not taken "with malice" as Mezzanine Lender had no incentive to force Walton to lose money as Mezzanine Lender's security interest was higher in priority than Walton's third mortgage and unsecured debt. Most notably, Walton **expressly requested** the involvement of **both** lenders in these activities when it could not get sufficient responses from the Developer. SUMF, ¶¶ 19-22. Remarkably, Walton now sues Mezzanine Lender for allegedly doing what Walton requested Mezzanine Lender do.

The only act alleged by Walton that could arguably rise the level of interference with the Construction Contract is the idea that Mezzanine Lender instructed Developer not to pay Walton

for its work.  This allegation is just that: an allegation—Walton has presented no admissible

evidence demonstrating that Mezzanine Lender instructed Developer not to pay Walton or

influenced Developer's failure to pay Walton.  Developer's failure to pay Walton arose out of

Developer's lack of money—just like the owner in *Creative West*.  Notably, if Walton alleges

that Developer did not have funds to pay it and that was the fault of a lender, the Court should

recognize that Senior Lender's loan was intended to finance construction and had unfunded

commitments left at the time Walton was not being paid by Developer for its work.  SUMF, ¶ 35.

By contrast, Mezzanine Lender's loan was fully funded at the beginning of construction for land

acquisition—and no monies were left unfunded to provide Developer with funds to pay Walton.

SUMF, ¶ 6.  The Court should enter summary judgment in favor of Mezzanine Lender and the

other Starwood defendants on Walton's tortious interference claim.

### F.   WALTON'S CLAIM FOR FRAUD FAILS BECAUSE THE STATEMENTS WALTON ALLEGES CONSTITUTE FRAUD ARE NOT LEGALLY SUFFICIENT AS THE BASIS FOR A FRAUD CLAIM.

Walton bases its fraud claim on statements Walton alleges were made by Jeff Morris and

Byron Hayes at times in June and July 2008 to the effect of "if Walton does certain things, I

[Morris or Hayes] will see to it that Walton gets paid."  More specifically, Walton employees

testified at deposition as follows:

| | |
|---|---|
| Bill Petty: | He [Jeff Morris] said, give us that -- satisfy this audit, we agreed that they have a right to audit, satisfy this audit, you will be paid, right.  Now, it's close to his exact words as I can get. Dep. Tr. of Bill Petty, p. 162, ll. 20-23. |
| Steve Ellis: | And I believe that he [Jeff Morris] did tell us he would pay us, when he was here.  As long as you finish the job, you will get paid. Dep. Tr. of Steve Ellis, p. 135, ll. 21-23. |
| | I believed that we left, we being everybody with Walton that attended the [July 2, 2008] meeting, left believing that Jeff Morris, Starwood, if we kept working would get us |

paid on the project.  Would pay us or get us paid.  *Id.*, p. 180, ll. 3-7.

In Florida, fraud must be pled with particularity and be based on <u>specific</u> representations of material fact.  *See* Fla. R. Civ. P. 1.120(b); Fed R. Civ. P. 9(b); *Allen v. United Zinc Co.*, 60 So. 182, 64 Fla. 171, 172 (Fla. 1912) ("To constitute fraud, a misrepresentation must be of a specific material fact that is untrue and known to be so . . . .").  "Averments in pleas of mere opinions and promises and of indefinite matters are not sufficient to show fraud."  *Allen*, 64 Fla. at 171; *see also Century 21 Admiral's Port, Inc. v. Walker*, 471 So.2d 544, 545 (Fla. 3rd DCA 1985) (citing *Staheli v. Kauffman*, 122 Ariz. 380, 595 P.2d 172 (1979) (promise too indefinite to be relied upon); *Grosser v. Kandel-Iken Builders, Inc.*, 647 S.W.2d 911 (Mo.Ct.App.1983) (statement too vague to support an action for fraudulent misrepresentation)).

The statements Walton alleges were made by Jeff Morris and Byron Hayes, apparently on behalf of all defendants, simply do not rise to the level of fraud, as required by Florida law.  The critical consideration for the court here is not what Jeff Morris and Byron Hayes <u>did</u> say, which is disputed between the parties, but rather what Jeff Morris and Byron Hayes <u>did not</u> say, which is <u>undisputed</u>.  SUMF, ¶¶ 42, 43.  All Walton personnel questioned on the subject clearly state that no representative of Mezzanine Lender expressly and specifically stated Walton would be paid for its work on the Project directly by any of the Defendant entities.

> Steve Ellis:  He [Byron Hayes] said – like I said before, he never said the words, Starwood would pay you.  He represented Starwood and I knew that for a fact and he told me, that we would get paid.  Dep Tr. of Steve Ellis, p. 201, ll. 10-13.

Tom Budde, Walton's then-Chief Administrative Officer, testified as follows:

> Q.  You said earlier that Mr. Morris said, you will get paid, Walton will get paid.  Were those the words that he used?
>
> A.  He used words to that extent, yes.

Q.     Did Mr. Morris specifically state in your presence that Walton would be paid directly by Starwood Capital Group Global, LLC?

A.     No.  He did not say those words.

Q.     Did Mr. Morris say in your presence that Walton would be paid for its work on Laketown Wharf by Starwood Asset Management, LLC?

A.     He did not say those words.

Q.     Did Mr. Morris in your presence say the words that Walton would be paid for its work on Laketown Wharf by Laketown Funding, LLC?

A.     He did not say those exact words.

Q.     Did Mr. Morris in your presence say specifically that Walton would be paid by Starwood for its work on the Laketown Wharf project?

A.     He did not say in those direct words.

Dep. Tr. of Tom Budde, p. 88, l. 7 – p. 89, l. 1.

Walton's then-President Bill Petty summed up Mr. Morris' statements as follows:

Q:     Did he [Jeff Morris] tell you, what company would pay Walton?

A:     No.  No.  You know what, in the heat of that whole meeting, the whole spirit of the meeting was that necktie, thousand, $2,000 suit, coming in on the Fourth of July weekend.  Representing the whole thing, coming in like that, was being theatrical.  He came in, he did not say, you satisfy this audit Bill Petty and Starwood will write you a check.  But, when he's sitting there, representing Starwood that, Jerry, you can't find Jerry, Tom Duggan's dead or moved, right.  He's representing that he will pay or cause happen that payment, right.  That's what he said and that's the way I took it.

I didn't interrogate him, I'm not a lawyer looking for a -- it would've been -- it would've been strange to me.  Can you put that in writing?  I didn't do any of that.  Because, I took him at his word.  I believed him.  I believed him when he told me that you satisfy this audit, sir.  You will be paid, right. . . .

> Q.   Did you understand after that meeting that if Walton finished its work and it got paid, pursuant to what Mr. Morris told you, that the money that would pay Walton would go from some Starwood company to Laketown Wharf, LLC and then to Walton or did you understand that it would go from some Starwood entity directly to Walton via check or wire?
>
> A.   I didn't. I didn't understand how it would happen. I believed one thing, that it would happen. That's it. The transaction -- I didn't -- I didn't know. I did believe that it would happen though.

Dep. Tr. of Bill Petty, p. 163, l. 1 – p. 164, l. 18.

At best, Walton's fraud claim is based on an <u>implication</u>—that Jeff Morris or Byron Hayes implied to individuals working for Walton in June and July 2008 that, if Walton finished the job and completed information required for an audit, that Walton would be paid by someone, and Walton inferred from the identity of the speaker that such someone could be "Starwood." Walton's contemporaneous actions confirm Walton's understanding of the statements made by Mr. Hayes or Mr. Morris at the time: that if any payment was forthcoming to Walton, such payment would be made by Developer—the entity that held the Construction Contract and from which all prior payments for Walton's work on the Project had come. SUMF, ¶¶ 26-27, 42. As Steve Ellis, Walton's 30(b)(6) corporate representative, put it:

> Q.   Would you agree that as of July 11, 2008 [after the meeting in New Orleans with Jeff Morris], you were still looking to Laketown Wharf Condominiums to be the entity that would pay Walton for its work on the project?
> [Objection]
>
> A.   As I explained earlier, we always -- **my belief was that we would get paid from Laketown Wharf, as long as they were an entity, until they went bankrupt.** We knew it was going to happen, we heard rumors of it. We always presumed that the money would be funded out of Star Wars into that account and paid to us. Starwood not Star Wars.

Dep. Tr. of Steve Ellis, p. 163, l. 17 – p. 164, l. 4 (emphasis added).

16931671.1

29

The fraudulent statements Walton alleges were made is that "the Starwood Defendants made specific representations to Walton that if Walton continued to perform and complete the Project work, <u>the Starwood Defendants would process and pay Walton's payment applications</u> for Project work and address Walton's requests for a time extension and additional compensation." Doc. 18, ¶ 62. Walton's deponents admit those words were never used and that such statements were never specifically made. Those deponents agree that neither Byron Hayes nor Jeff Morris ever specifically stated that Mezzanine Lender, Starwood Asset, or Starwood Capital would pay Walton directly for any amounts related to the Project or specifically represented that Walton could expect payment directly from any of the Defendant entities. As a result, Walton's fraud claim fails, and the Defendants are entitled to summary judgment.

## IV.    CONCLUSION.

For the above-stated reasons, the Defendants are entitled to summary judgment on all counts raised by Plaintiff, and Defendants respectfully request that the Court enter an Order granting summary judgment in this Action in favor of Defendants.

Respectfully submitted this 20th day of April, 2012.

SUTHERLAND ASBILL & BRENNAN LLP

Jennifer W. Fletcher
Florida Bar No. 332089
Kent W. Collier
Florida Bar No. 39622
999 Peachtree Street, N.E.
Atlanta, GA 30309-3996
Phone: 404-853-8000
Fax: 404-853-8806
*Attorneys for Defendants Laketown Funding, LLC, Starwood Asset Management, LLC, and Starwood Capital Group Global I, LLC (f/k/a Starwood Capital Group Global, LLC)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

WALTON CONSTRUCTION          )
COMPANY, LLC,                )
                             )
    Plaintiff,          )
                             )
v.                           )          Case No. 4:10-cv-137-WS/CAS
                             )
CORUS BANK, et al.,          )
                             )
    Defendants.         )
_____)

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing DEFENDANTS'

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT with

the Clerk of Court using the CM/ECF system which will automatically send e-mail notification

of such filing to the following attorneys of record:

Eric Lewis Nelson
SMITH CURRIE & HANCOCK LLP
2700 Marquis One Tower
245 Peachtree Center Ave. NE
Atlanta, GA 30303-1227

Brian G. Rich
BERGER SINGERMAN PA
125 S. Gadsden St.
Suite 300
Tallahassee, FL 32301

This 20th day of April, 2012.

_____
Kent W. Collier
Florida Bar No. 39622